L. J. SMITH CONSTRUCTION COMPANY v. TATE.

Opinion delivered January 16, 1922.

1. MASTER AND SERVANT—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.— Evidence tending to prove that the negligence of defendant's servants in hooking one of the chains of a dump car with a

twisted chain caused the chain to fly out and strike an implement in the hands of plaintiff's intestate, which caused him to fall and receive fatal injuries, *held* to sustain a finding that such negligence was the principal cause of intestate's death.

2. MASTER AND SERVANT—ASSUMED RISK.—Where the foreman of a dumping crew, after knocking one of the chains of a dump car loose, discovered that the other chain was twisted, and that it was liable, when released, to swing out and strike him, he cannot be said, as a matter of law, to have assumed such risk where it does not appear under the circumstances that the risk of releasing the second chain was greater than a person of ordinary prudence would have undertaken.

3. TRIAL—INSTRUCTION—SPECIFIC OBJECTION.—Where the proof narrowed the issue in a case to the single question as to the duty of the master to furnish safe appliances, and the court instructed as to the master's duty to furnish safe appliances and place to work, an objection as to the reference to the place of work should have been specific.

4. APPEAL AND ERROR—INSTRUCTION—INVITED ERROR.—Appellant cannot complain of an instruction as abstract where he requested an instruction on the same issue.

5. TRIAL—INSTRUCTIONS—OBJECTIONS IN GROSS.—An objection in gross to five separate instructions is ineffectual.

6. APPEAL AND ERROR—HARMLESS ERROR.—While statements of defendant's superintendent concerning the necessity or propriety of removing plaintiff's intestate to a hospital were improperly admitted, such evidence was not prejudicial.

Appeal from Boone Circuit Court; *J. M. Shinn,* Judge; affirmed

*John W. Nance,* for appellant.

Appellant was not an insurer of the safety of the deceased. 18 R. C. L. par. 60, p. 544; 80 Ark. 260; 59 Ark. 465; 56 Ark. 206; 56 Ark. 232.

The fact that deceased was injured while doing appellant's work, is not sufficient in itself to create liability. 91 Ark. 389; 79 Ark. 437.

The fact that the chain was twisted and the injury to deceased resulted thereform is not enough. Negligence must be shown. 77 Ark. 367; 41 Ark. 283; 58 Ark. 168; 76 Ark. 436.

The injury must have been the natural and probable consequence of the chain being twisted, and such conse-

quence must have been foreseen by appellant or its em-
ployees in the light of attending circumstances.  18 R.
C. L. 548; 113 Ark. 60; 105 Ark. 392; 90 Ark. 34; 86 Ark.
289; 35 Ark. 602; 92 Ark. 138.

If the deceased had knowledge of the negligence and
dangerous condition, equal or superior to that of appel-
lant, he can not complain of appellant's negligence.  The
doctrine of comparative knowledge should apply.  18 R.
C. L. par. 173 p. 685; 45 Ark. 318; 96 Ark. 206.

Deceased assumed the risk of all the usual and ordi-
nary dangers incident to his work.     18 R. C. L. p. 676;
35 Ark. 602; 48 Ark. 388; 95 Ark. 560.

The ordinary dangers incident to the employment
are those which the employee has notice of or which
are patent and obvious to him.  18 R. C. L. par 167, p.
676.  Deceased assumed the risk of all dangers arising
from the negligence of appellant, of which he had knowl-
edge and of which he appreciated the danger.  96 Ark.
387; 88 Ark. 548; 95 Ark. 560; 97 Ark. 486.

Instructions 1, 2, 4 and 5 were erroneous as being
abstract, without testimony to support them, and con-
flicting.

Error to permit testimony of witness Grassman to be
introduced concerning the matter of sending the deceased .
to a hospital after he was injured, and also to permit
witness Greaves to detail alleged statements of Grass-
man about the same matter.  100 Ark. 114.

*George J. Crump* for appellee; *John I. Worthington,*
of counsel.

Appellant failed to carry his objection, which was
a general one, into his motion for new trial, hence he
cannot now insist on any alleged error.  24 Ark. 224; 126
Ark. 564.     The only objection saved by appellant to an
instruction in his motion for new trial is to No. 2, which
are deemed to have been waived, since appellant asked
and the court gave his instructions 13, 14, and 15 on the
same subject. 132 Ark. 454; 121 Ark. 570.    The testimony
of the witnesses mentioned by appellant could not have

been prejudicial or amount to reversible error. In the case cited by appellant similar testimony was considered for the purpose of reducing an excessive verdict. It was not claimed that the verdict in this case is excessive.

The main issue in the case was whether or not the chain was negligently twisted, and the jury were required to so find before they could find a verdict for appellee, and their finding is conclusive. 18 R. C. L. 547; 104 Ark. 4.

Deceased may have been negligent, but it was not an assumption of the risk. Proof of an emergency makes a case for the jury. 18 R. C. L. p. 654, sec. 147. See also 82 Ark. 11, 53 Ark. 458; 79 Ark. 53; 1 Labatt, Master & Servant, No. 333; 100 Ala. 451; 99 Ala. 346.

Deceased did not appreciate the danger. 18 R. C. L. p. 649, sec. 141; also p. 663, sec. 156.

The instructions were correct, and the issues settled by the jury. 143 Ark. 122; 88 Ark. 243.

McCULLOCH, C. J. This is an action against appellant to recover for the benefit of the estate and the widow and next of kin of W. R. Tate, deceased, damages accruing by reason of the death of the said deceased while working in the service of appellant.

Appellant is a foreign corporation, and at the time of the injuries to Tate, which resulted in his death, was engaged in performing railroad construction work for the Missouri Pacific Railroad Company. The work consisted of filling in a number of high trestles in Boone County on what is known as the White River Branch of said railroad company. These trestles were from 60 to 100 feet high, and they were filled in with rock and earth so as to build a dump and eliminate the trestles. Appellant had been engaged in this work for about a year and its predecessor in the contract had likewise been engaged for more than a year before that time. Tate was foreman of the dumping crew; he had been so engaged throughout the period of ap-

pellant's work under the contract, and also had been engaged under appellant's predecessor in this work. This crew consisted of a foreman and four helpers. The earth and rock was taken from adjacent hillsides and by means of steam shovels and other equipment was loaded into dump cars, which were hauled to the trestles by engines and there unloaded so as to dump the dirt under the trestles. The dumping was, of course, done while the cars were standing on the trestles. The trestle at which deceased received his injuries was originally 119 feet high, and at the time the injury occurred it had been filled in so that it was about 60 feet high. Tate lost his balance and fell from the trestle while releasing the chains so as to cause the car to expel the earth and rock from it. These cars were 26 feet in length, 9 feet in width and 21 inches deep and were of a capacity of 60,000 lbs. There were two pairs of dump chains on each side of a car, one near each end of the car, so that the load of dirt could be expelled from either side of the car, according to the necessities of the case. One end of the dump chains with a ring or clevis on it was fastened to the body of the car, and the other end with a hook on it was fastened to the truck of the car. The two ends were fastened together by a connection made between the hook and the clevis. Before the car was loaded, the two ends of each dump chain were thus hooked together, and the chains became tightened as the load increased. This was, of course, done after each dumping trip was completed. When a car was in place to be dumped, the ends of the chain were disconnected by knocking loose the ring or clevis, and when each of the two pairs of dump chains on the side of the car were disconnected, the weight of the load caused the floor of the car on the opposite side to drop down suddenly so that the load slided out. This knocking loose of the ring or clevis was done by an iron implement called a knocker. It was part of the duty of the foreman of the dumping crew to knock loose the clevis, and Tate, while performing this service, fell from the trestle and received in-

juries which caused his death fourteen days later. When he struck the clevis with the knocker and the hook became disconnected, it swung out with such force that it hit the knocker in Tate's hands, and caused him to lose his balance. He was standing on the end of the ties when this duty was performed.

The dump chains were composed of links about six inches in length, made of steel or iron rods about an inch in diameter. The chains and hooks, of course, were in plain view of a person using the knocker, and according to the undisputed evidence in the case a twist in the chain could be readily observed by the one doing the knocking.

Tate had been sick for a week or more before the date of his injury and returned to his work that morning considerably weakened by the illness. His injury was received while he was dumping the first car. This occurred on Monday morning, and the train of cars had been loaded the Saturday before, during Tate's absence, and the first opportunity he had to observe the manner in which the chains had been hooked together was after he had knocked loose the chains on one end of the car, and with the whole weight of the load on the last chain he had proceeded to knock it loose. He was then, as before stated, standing on the trestle 60 feet high.

There was, according to the testimony, a rod on the side of the car which he could have taken hold of with his hand not using the knocker, or he could have taken hold of the flange of the wheel. Before the car was dumped, the wheels were fastened to the track by means of heavy chains so as to prevent the car from turning over or "bucking" when the bottom dropped for the load to slide out.

There are several acts of negligence charged in the complaint, but the one upon which appellee relies to sustain the recovery of damages is that this particular pair of dump chains had been improperly connected together—that, instead of properly connecting the hook and the clevis so that the hook would hang parallel

with the body of the car, it was connected with a half twist in the chain so that the hook turned out from the body of the car, and when the whole weight of the load fell on this chain it would, when released by the stroke of the knocker, swing out with great force and strike the implement in the hands of the foreman.

The complaint also contained allegations that there was negligence with respect to overloading the car, also that the handle of the knocker furnished to deceased was too long for proper use in performing his duties.

Appellant in its answer denied each of the charges of negligence and pleaded both contributory negligence and assumption of the risk on the part of Tate. At the trial the jury returned a verdict in favor of appellees, and fixed damages at the sum of $5,000 for the benefit of the widow and next of kin, but awarded no damages for the benefit of the estate.

The principal ground urged here for reversal of the judgment is that the evidence is not sufficient to sustain the verdict, and that the trial court should have given a peremptory instruction. The contention is that there was no negligence on the part of appellant's servants proved, and that, according to the undisputed evidence, Tate should be held to have assumed the risk. Each of these issues was submitted to the jury upon correct and appropriate instructions, and we are of the opinion that the evidence was sufficient to sustain the verdict.

The two ends of each of the pair of dump chains were hooked together by other servants of appellant during Tate's absence. It was not, according to the evidence, part of his duty to see that the chains were properly hooked together. There was no duty of inspection resting upon him further than to take notice of obvious defects. The defect of hooking the chains together with a half-turn or twist might appear at first glance to be trivial, but, when considered in the light of the testimony, it is highly important and was the proximate cause of Tate's injury. The testimony was sufficient

to warrant the conclusion that, if the two ends of the chain had been hooked together properly, the lower end with the hook on it would, when released from the upper end, have dropped downward, and would not have swung out with any considerable force, but that, when hooked together with a half-turn or twist, when released from the strain of the whole load, it would violently swing out and strike the knocker in the hands of the person using that implement. There was evidence that this had occurred several times before when the ends of the chains were improperly hooked together as in this instance, but it had never occurred when the chains were properly hooked together. With this danger likely to arise, it was highly important to properly hook the ends of the chain together, for the work of releasing them was always done on a high trestle where the slightest impact or blow might cause the person performing his duty there to lose his balance and fall from the trestle. There were means of safety provided to guard against this danger, and it is clear that Tate was guilty of contributory negligence in not taking these precautions for his own safety, but that phase of the case will be discussed later. We think that the evidence was sufficient to sustain the charge of negligence, and that this act of negligence in improperly connecting the chains was the proximate cause of Tate's injury.

Nor can it be said, as a matter of law, under the undisputed evidence, that Tate assumed the risk. It is clear from the testimony that, after the first chain on the other end of the car was released and the weight of the whole load was thrown upon the other chain, the defect was open and obvious to Tate when he was about to knock the clevis loose in order to release the chain. He was a man who had had long service and experience in this particular kind of work and must have been aware of whatever danger there was in knocking loose the clevis under those circumstances; but it cannot be said that the danger was indisputably an absolute one so that a man of reasonable prudence would not have un-

dertaken to release the chains under those circumstances. The danger undoubtedly existed, but it might have been avoided. Tate was then placed in a situation that he was called upon to make a choice of proceeding with the work, notwithstanding the danger, or retiring from the dangerous situation by causing the car to be removed from the trestle at great inconvenience and perhaps with other attendant dangers. The car was then chained down to the track to prevent "bucking," and one of the pairs of dump chains had already been released and the whole load was thus thrown on the remaining pair of chains. The pair of chains which had already been released could not have been reconnected without dumping the car, and in order to remove the car from the trestle without dumping it, it would have been necessary to take loose the chains that held it to the track and haul it away with one pair of chains released and the other holding it. This constituted an emergency in which Tate, as foreman of the crew, was called on to compare the dangers attending the release of the chains with the inconvenience and attendant dangers of removing the undumped car and to decide what course he should pursue. Under those circumstances he is not, as a matter of law, deemed to have assumed the risk in making the choice. The principle which controls this case was stated by Judge Riddick in the opinion of this court in *Fordyce* v. *Edwards,* 60 Ark. 438, where a locomotive engineer was injured while performing his duties by reason of a defect in the pilot of his engine. This defect was discovered by the engineer while out on a trip, and in disposing of the case the court said:

"If appellee, without fault on his part, first discovered the condition of the pilot after he had commenced his trip, and the defect was not such as to render the engine immediately dangerous, he would not be required to abandon his engine, or lose his right to recover by continuing on his journey until he reached a station where the defect could be cured, or a new

engine obtained, if the defect was such that it was reasonable to believe that the engine might still be safely operated by the exercise of great care, and if the risk was not greater than a person of ordinary prudence would have taken under the same circumstances.''

In the present case it cannot be said, as a matter of law, that the risk of releasing the chains under the circumstances mentioned was greater than a person of ordinary prudence would have undertaken. That was a question for the determination of the jury, for, as before stated, the extent of the danger was, under the circumstances, a relative one, and not absolute. Tate's contributory negligence consisted, not so much in proceeding with the work of knocking loose the clevis, but in doing so without observing the proper precautions. But for our statutes on the subject of contributory negligence in cases of this sort, recovery would be denied on account of Tate's contributory negligence in failing to take hold of the rod on the car or the flange of the wheel to steady himself while knocking loose the clevis. The statutes of this State provide that in suits against corporations for personal injuries contributory negligence shall not bar a recovery, but that the damages ''shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.'' Crawford & Moses' Digest, § 7145. This statute was, in substance, submitted to the jury by the court in its instructions, and the very moderate assessment of damages made by the jury indicates that it had its controlling effect upon the minds of the jury in assessing the damages. It appears reasonable from the testimony that, if the jury had found that there was no negligence upon the part of Tate, a much larger sum would have been awarded.

It is next contended that the court erred in its instructions to the jury. The court gave an instruction (No. 4) over appellant's general objection as follows:

"I charge you that it was the duty of the defendant to exercise ordinary care to provide the deceased with reasonable safe appliances, tools and place to work."

It is true that the charges of negligence were by the proof narrowed to the single question whether or not the chain was properly hooked, but the chain, when adjusted for the work, was a part of the appliances, and appellee was entitled to an instruction defining the duty of the employer with respect to these appliances. The purpose of this instruction was to define the duty of the employer with respect to the degree of care he should observe in matters about which there is a charge of negligence, and the fact that the reference to the duty in regard to the place of work was improperly incorporated in this instruction should have been called to the attention of the court by a specific objection.

The court also, over the objection of appellant, gave instruction No. 2, which not only submitted the question of negligence in regard to the hooking of the chain, but submitted all the other charges of negligence by telling the jury that if one of the alleged acts of negligence had been established by the evidence, it was sufficient for recovery without proof of the other acts of negligence. The objections now urged against this instruction is that it improperly submitted the charges of negligence in regard to furnishing a knocker with a handle that was too long, and negligence in overloading the car, whereas, there was no proof to justify the submission of either of those issues. Appellant asked an instruction submitting the issue with respect to the knocker, and is therefore in no attitude to complain of the court in giving the instruction on that subject at the request of appellee. *National Fruit Products Co.* v. *Garrett,* 121 Ark. 570. But there is still another reason why we cannot now review this error in regard to the charge as to either of the acts of negligence. Instruction No. 2 consisted of five separate paragraphs devoted to distinct phases of the case and was tanta-

mount to five separate instructions. The general objection amounted to an objection in gross to five separate instructions, and if either one of these separate instructions was correct, that method of objection was ineffectual to bring up for review the alleged error. *Young* v. *Stevenson,* 75 Ark. 181; *Wells* v. *Parker,* 76 Ark. 41; *Dowell* v. *Schisler,* 76 Ark. 482; *H. D. Williams Cooperage Co.* v. *Clark,* 105 Ark. 157.

There were other criticisms of the court's instructions by assignments of error which we do not deem of sufficient importance to discuss.

Finally, it is insisted that the court erred in permitting appellee to prove certain statements made by Mr. Grassman, appellant's superintendent, concerning the necessity or propriety of removing Tate to a hospital after he was injured. After Tate fell from the trestle he was removed to his home and lived fourteen days. There is a conflict in the testimony as to whether or not he was conscious after he fell, and the verdict of the jury failing to award damages on that branch of the case settles that issue in favor of appellant. During the cross-examination of Mr. Grassman, who was introduced as a witness by appellant, he was asked if the suggestion had not been made to him that Tate be taken to the hospital, that he replied in the negative, saying, "We will lose 10 cars of dirt per day." The witness denied that any such conversation took place, and appellees then introduced, over appellant's objection, witness Graves, who stated that in a talk with Mr. Grassman after Tate fell from the bridge he (witness) asked the question whether or not Tate should be sent to the hospital, and that Grassman replied, "No, he is not hurt bad enough to take him to the hospital." Witness further stated that he asked Grassman why they did not telephone to Tate's wife, and he replied there was no use of her knowing it until he got home. We cannot see that this could possibly have had any prejudicial effect. The extent of Tate's injuries were not known at that time, and the alleged statement of

Grassman was a mere expression of his opinion that it was unnecessary to take him to the hospital. Of course, this statement was inadmissible for any purpose whatever, but we should not reverse a judgment for error where it appears improbable that any prejudice could have resulted.

Upon the whole, we find no reversible error in the record, and the judgment is therefore affirmed.

SMITH, J., dissents.